**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**NANCY KAY HENDRICKS,**

　　　**Plaintiff,**

**vs.**　　　　　　　　　　　　　　　　**Case No. 1:12cv249-CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

　　　**Defendant.**

_____/

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a Social Security case referred to the undersigned upon consent of the

parties, doc. 10, and reference by Senior District Judge Maurice M. Paul.   Doc. 11.

After careful consideration of the entire Record, the Court reverses the decision of the

Commissioner and remands the case for further consideration.

## I.  Procedural History

On or about October 2, 2007, Plaintiff, Nancy Kay Hendricks, applied for a period

of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social

Security Act (Act) and also applied for Supplemental Security Income (SSI) benefits

pursuant to Title XVI of the Act for a period of disability with an alleged onset date of

March 27, 2007, and alleged disability due to "COPD lung disease."   R. 23, 450-52, 485.

(Citations to the Record shall be by the symbol "R." followed by a page number that

appears in the upper right corner.)[1]   It appears Ms. Hendricks first alleged mental

impairments after her applications were initially denied.   *See, e.g.*, R. 494, 496.

Plaintiff's claims were denied initially on December 7, 2007, and upon

reconsideration on July 18, 2008.   R. 23, 412-13, 418-23, 432-35, 1401-04.   On August

26, 2008, Plaintiff requested a hearing.   *Id.*   On April 14, 2010, an evidentiary hearing

was held in Ocala, Florida, and conducted by ALJ Joseph A. Rose.   R. 23, 36, 1422-55.

Richard J. Hickey testified as an impartial vocational expert.   R. 23, 1448-53.   Plaintiff

was represented by Lori A. Gaglione, an attorney.   R. 18-19, 23, 425, 1424.

On June 21, 2010, the ALJ entered his decision concluding that Plaintiff is not

disabled.   R. 23-36.[2]   On June 29, 2010, Plaintiff filed a request for review of the ALJ's

decision, which included written argument dated August 4, 2010.   R. 11, 14-17, 1405-08.

On September 14, 2012, the Appeals Council denied Plaintiff's request for review.   R.

9-11.   The ALJ's decision stands as the final decision of the Commissioner.

On November 2, 2012, Plaintiff filed a Complaint requesting judicial review of the

Commissioner's final decision.   Doc. 1.   Both parties filed memoranda of law, docs. 26

and 27, which have been considered.

## II.  Findings of the ALJ

---

[1]   Plaintiff previously applied for DIB and SSI on September 8, 2004, and attended a hearing before Administrative Law Judge (ALJ) Albert D. Tutera who denied Plaintiff's applications for benefits on March 26, 2007.   The Appeals Council denied review on July 17, 2007.   R. 37-39, 45-53, 454.

[2]   For the purpose of considering SSI, the relevant period of time for this case is March 27, 2007, Plaintiff's alleged onset date, to June 21, 2010, the date of the ALJ's decision.   For the purpose of considering a period of disability and DIB, the relevant time period is March 27, 2007, to March 30, 2009, the last date of insured status. R. 23, 36.

The ALJ made several findings relative to the issues raised in this appeal:

1.   "The claimant meets the insured status requirements of the Social Security Act through March 30, 2009."  R. 25.

2.   "The claimant has not engaged in substantial gainful activity since March 27, 2007, the alleged onset date."   *Id.*

3.   "The claimant has the following severe impairments: (1) Affective disorder with psychosis, (2) Chronic obstructive pulmonary disease [COPD], and (3) Seizure disorder."   *Id.*   The ALJ noted Plaintiff's "non-cardiac chest pain and right flank pain" and concluded they "are not severe based on the lack of objective findings in the emergency medical records."   *Id.*

4.   "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 26.   The ALJ considered Plaintiff's COPD and seizure disorder and determined that "[d]espite the combined impairments, the medical evidence does not document listing level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."   *Id.*   The ALJ also found that Plaintiff's "mental impairment of an affective disorder with psychosis does not meet or medically equal the criteria of listing 12.04."   *Id.*   In making this finding, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in listing 12.04B, the "paragraph B" criteria.   R. 26.   Relying on Exhibit 2E, a Function Report-Adult, R. 456-68, dated October 27, 2007, the ALJ determined that Plaintiff had *mild* limitations in activities of daily living; *mild* difficulties in maintaining social functioning; *moderate* difficulties in maintaining concentration, persistence or pace; and *no* episodes of decompensation of extended duration (based on a lack of any medical evidence).   R. 26.   The ALJ also considered the "paragraph C" criteria of listing 12.04 and concluded the evidence did not establish the presence of this criteria.   R. 27.[3]

5.   "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant should never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, can frequently balance, stoop, crouch, kneel and crawl.   The claimant should avoid concentrated exposure to extreme temperatures, irritants such as fumes, odors, dust, gases, and poorly ventilated areas, and unprotected heights.   Work is

---

[3]   The ALJ stated that the limitations identified in the "paragraph B" criteria are not an RFC assessment, but are used to rate the severity of mental impairments at steps two and three.   *Id.*

limited to simple, routine and repetitive 1-2 step tasks, in a work environment free of fast paced production requirements, involving only simple 1-2 step work related decisions, with few, if any, work place changes." R. 27. In making this determination, the ALJ reviewed evidence of record, R. 28-34, that will be discussed herein.

6. "The claimant is unable to perform any past relevant work" as a retail manager. R. 34.

7. The claimant was 47 years old, defined as a younger individual age 18-49, on the alleged disability date; has at least a high school education and is able to communicate in English; and "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs in significant numbers in the national economy that the claimant can perform," such as Cashier II and Ticket Seller, which are unskilled, are within the light exertion level, and have a SVP (specific vocational preparation) of 2. R. 34-35, 1451-52.

8. "The claimant has not been under a disability, as defined in the Social Security Act, from March 27, 2007, through the date of this decision " R. 35.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[4]

---

[4] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard,

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of

---

however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of

Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the

application for benefits.   A positive finding at step three results in approval of the

application for benefits.   At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.   Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is not

disabled.   If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

If the Commissioner carries this burden, the claimant must prove that she cannot perform the work suggested by the Commissioner.    Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Legal Analysis

### 1.  Introduction

Plaintiff argues the ALJ erred (1) in determining Ms. Hendricks' mental RFC assessment because he relied on outdated state agency opinions and examinations and gave only a cursory review of the mental health medical evidence from mid-2008 through the date of the hearing decision; (2) in not crediting the opinion of Ms. Hendricks' treating therapist, Maria Hernandez, M.S., regarding her mental status; and (3) in failing to meaningfully analyze the impact of Ms. Hendricks' back and neck conditions on her ability to function.   Doc. 26 at 11-23.   Regarding issues one and two, the Commissioner argues that such evidence supports the ALJ's mental RFC assessment and weight given to the medical opinion evidence.   Doc. 27 at 14-21.

### 2.  The Medical Evidence

For completeness sake, medical evidence that predates the March 27, 2007, alleged onset date is included herein.   ALJ Rose begins his discussion of the medical evidence with records beginning on March 31, 2007.   R. 30.

Well before her alleged onset date in this case, in 1993, Ms. Hendricks was treated for hypertension.   R. 213-18.   In November 2003, she reported wrist pain due to working as a cashier with repetitive movements.   R. 277-78.   She was diagnosed with possible

pre-carpal tunnel syndrome (CTS).   *Id.*   In 2003, she was also treated for dysuria,

backache, shortness of breath, and dizziness.   R. 271, 276.

Ms. Hendricks had an abnormal spirometry that revealed restrictive airway disease and

was diagnosed with chest pain and chronic obstructive pulmonary disease (COPD).

R. 249.   Progress notes dated December 6, 2004, revealed coarse breath sounds in her

lungs.   R. 234.   Ms. Hendricks was diagnosed with COPD and vertigo and was

prescribed Advair, Spiriva, Albuterol, Prednisone, and Meclizine.   *Id.*   On July 20, 2004,

Ms. Hendricks underwent a stress test that was positive.   R. 188.   Additional testing by

Dr. Gros, a cardiologist, in October 2004 resulted in diagnoses of exertional dyspnea and

restrictive lung disease.   R. 189-91.

At the request of the state agency, on December 21, 2004, Lance I. Chodosh,

M.D., examined Ms. Hendricks.   R. 192-98.   Ms. Hendricks reported having difficulty

breathing since July 2004 and was diagnosed with emphysema.   R. 192.   She reported

occasional cough, some chest tightness, constant dyspnea and fatigue, limited stamina

and being unable to exert for very long.   Ms. Hendricks described constant pressure in

the posterior chest and mid back and was previously diagnosed with carpal tunnel

syndrome of the right hand and wrist.   *Id.*   She was diagnosed with probable mild

chronic lung disease secondary to smoking, back pain, and chronic discomfort in the right

hand, uncertain etiology, without signs of impairment.   R. 195.   Dr. Chodosh did not

assign any significant limitations.   *Id.*

At the request of the state agency, on June 28, 2005, Andres Nazario, Jr., Ph.D.,

LMFT, a licensed psychologist, examined Ms. Hendricks.   R. 335-37.   Ms. Hendricks

reported a diagnosis of mental illness and being treated at Meridian Behavioral

Healthcare, Inc. (Meridian) for mental illness around 1997 or 1998 because she was

thinking of suicide.   She went to Meridian several times at that time and reported no other

mental health treatment.   R. 335.   She reported current depression for eight or nine

months at this time, crying a lot and mood swings, and feeling angry.

Ms. Hendricks reported she was molested when she was twelve for about a year and had

a brother that committed suicide.   R. 336.   Examination revealed, in part, she was

cooperative and alert throughout the interview; her mood seemed somewhat depressed

and her affect was flat; she was oriented to person, place, and time; was able to perform

a series of mental status tests without error or difficulty; and there was no indication of

suicidal or homicidal ideation.   R. 336-37.   She was diagnosed with depressive

disorder, NOS.   She appeared able to concentrate, follow directions, to interact with

others appropriately and manage her own financial affairs.   R. 337; *see*

R. 339-52 (Steven L. Wise, Psy.D.-Psychiatric Review Technique (PRT)-July 21,

2005-opining no greater functional limitations than mild, R. 349).

Ms. Hendricks was treated from June 2005 through December 2007 at the Dixie

County Health Department.   R. 368-96, 634-64.   During this time, she was treated for

chronic bronchitis, shortness of breath, right shoulder pain, abdominal pain and back

pain, and carpal tunnel syndrome.   R. 396.   Progress notes on August 23, 2006,

revealed diagnoses of bronchitis, renal failure, and incontinence with history of renal

artery stenosis.   R. 372.   On December 5, 2006, Ms. Hendricks was also diagnosed with

reactive airway disease, COPD, and allergic rhinitis.   R. 369.

Ms. Hendricks fell and injured her back in early April 2007.   R. 660.   She was diagnosed with back sprain.   *Id.*   As of May 2007, Ms. Hendricks reported dizziness, blurred vision, and fatigue.   R. 656-57.   She was diagnosed with headache and cervicalgia.   *Id.*   Due to anxiety and depression in October 2007, Ms. Hendricks was told to taper off Prozac and was started on Paxil for anxiety and depression.   R. 645.   In late fall 2007, Ms. Hendricks was diagnosed with anorexia and depression.   R. 643. About this time, she was diagnosed with syncope and hypotension.   R. 642.   In the meantime, Ms. Hendricks was still having pain in her shoulder and back as well as her cough.   R. 639.   She was diagnosed with likely bronchitis, chest pain, hypotension, and syncope. *Id.*

On November 6, 2007, Ms. Hendricks underwent a CT scan of the cervical spine. R. 607.   The scan showed focal moderate to advanced degenerative disc change at C5-C6 along with osseous foraminal narrowing.   *Id.*   A thoracic spine x-ray showed minimal changes and degenerative osteoarthritis, although it is also noted "[v]ery mild degenerative changes and a minimal dorsal kyphosis are present."   R. 610. Ms. Hendricks was treated in December 2007 for headache and left arm numbness.   R. 559-62.   She was diagnosed with a tension headache.   *Id.*

Ms. Hendricks underwent an EEG for syncope on January 11, 2008.   R. 557. She reported spells of feeling lightheaded and passing out with bilateral jerking of the lower and upper extremities.   This was an abnormal EEG because of the presence of left temporal sharp wave activity which could possibly be an interictal expression of an

underlying epileptogenic focus in the left temporal region. The reviewer suggested a clinical correlation. *Id.*

At the request of the state agency, on January 16, 2008, Dr. Chodosh examined Ms. Hendricks for the second time. R. 516-22. She reported experiencing about six syncopal episodes since October 2007 along with COPD symptoms with minimal exertion and reported being chronically depressed, with suicidal thinking at times. R. 516. Her functional status included that she was independent in activities of daily living, although family members stand by when she showers; she cannot walk more than 100 feet without resting, and cannot stand continuously for more than five minutes. She uses a cane when walking and standing for security, but does not require its use. R. 517. Her neck had no lymphadenopathy and her range of neck motion was normal. R. 518. Her back had no deformity, tenderness, or paraspinal muscular spasm. *Id.* Her straight leg-raise was negative to 90 degrees bilaterally. *Id.* Her gait was normal, including her heel and toe walk. R. 519. She was diagnosed with recurrent syncope of uncertain etiology, history of depression, mild COPD secondary to smoking, and reoccurring chest pain, almost certainly not of cardiac origin. Dr. Chodosh concluded, based only on objective evidence that Ms. Hendricks is able to stand, walk, sit, stoop, squat, and kneel and lift and carry at least 20 pounds occasionally, handle objects, and can see, hear, and speak normally. *Id.*

On February 4, 2008, Chris J. Carr, Ph.D., examined Ms. Hendricks. R. 523-26. On mental status evaluation, Ms. Hendricks was cooperative, alert, and attentive, although she had a depressed mood and sad affect. Her thought processes

were logical and organized. R. 525. She reported being easily irritated and easily overwhelmed and sometimes heard someone calling her name. She experienced passive suicidal thoughts on a regular basis, but there was no evidence of delusions. *Id.* She was diagnosed with post-traumatic stress disorder (PTSD) and major depression, recurrent, possibly with psychotic features. *Id.*

On February 29, 2008, John E. Long, M.D., a state agency physician completed a Physical Residual Functional Capacity Assessment. R. 546-53. Dr. Long opined that Ms. Hendricks was able to perform light work with certain environmental limitations; occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; sit, stand and/or walk with normal breaks about 6 hours in an 8-hour day; unlimited push and/or pull other than as shown for lift and carry; occasional climbing of ramps/stairs, but never climbing a ladder, rope, or scaffold; and frequent balancing, stooping, kneeling, crouching, and crawling. R. 548-50. No manipulative or visual limitations are noted. R. 549-50.

On February 18, 2008, Lauriann Sandrik, Psy.D, a state agency psychologist, completed a PRT. R. 528-45. In the PRT, Dr. Sandrik opined that Ms. Hendricks had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. R. 538. Dr. Sandrik provided consultant's notes. Dr. Sandrik had reviewed patient notes through February 4, 2008. R. 540. Dr. Sandrik also completed a Mental Residual Functional Capacity Assessment and opined that Ms. Hendricks was not significantly limited in most areas although moderately limited

in three areas: ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to complete a normal work weekday and workweek without interruptions from psychologically based symptoms.   R. 542-43; *see* R. 544 (functional capacity assessment narrative stating, in part, that Ms. Hendricks "appears mentally capable of completing simple, routine tasks in an appropriate amount of time").

On July 16, 2008, Alejandro F. Vergara, M.D., a state agency psychiatrist, completed a PRT and a Mental Residual Functional Capacity Assessment.   R. 736-46. Dr. Vergara opined that Ms. Hendricks retained the necessary mental capacity to do simple, repetitive-type tasks and assignments.   R. 738.   Dr. Vergara reached conclusions similar to those reached by Dr. Sandrik regarding her limitations.   R. 736-37, 738, 744.   Dr. Vergara also provided a narrative explanation of his findings. R. 738, 745.

From January 23, 2008, through February 13, 2008, Ms. Hendricks was treated on three occasions (after an initial evaluation) by Katherine E. Kiker, M.S., Steve Anton, Ph.D., and Glenn Ashkanazi, Ph.D., at the Dixie County Health Department.   R. 620-22, 626-28.   On January 23, 2008, Ms. Hendricks was referred by her physician for severe depression and current suicidal ideation.   R. 627-28.   On examination, Ms. Hendricks' affect and speech appeared flat and she confirmed suicidal ideation. She was thinking about slitting her wrists but would not because her family never leaves her alone.   She reported worry, intense sadness, hopelessness, frequent crying and lack of interest in things she used to enjoy, lack of appetite.   Her Beck Depression Inventory

was a 49 which suggested she was experiencing a number of depressive symptoms currently. She was diagnosed with major depressive disorder and environmental stressors. *Id.* She was continuing to suffer from depression one week later and again in February 2008. R. 622, 626. She was diagnosed with major depressive disorder. *Id.* On February 13, 2008, she reported her son was high on drugs and started an argument with her which ended in him threatening to kill himself. She reported thoughts of killing herself at this time and decided to call a local suicide hotline. She spoke with a counselor who was extremely helpful. Ms. Hendricks continued to display severe depressive symptomatology including suicidal ideation over the weekend, although she denied current suicidal ideations. She was prompted to engage in relaxation activities when she is feeling particularly stressed. Another session was scheduled for two weeks, although it appears this was the last session with these providers. R. 620.

Ms. Hendricks was treated at Dixie County Health Department from January 2008 through December 2008. R. 615-32, 914-922. Progress notes dated March 18, 2008, revealed another emergency room visit and fainting in the waiting room. R. 617-18. She reported low back pain and walked with a cane. She was diagnosed with low back pain, syncope, anxiety and depression. *Id.* Her back pain did not improve the following month and she also had a seizure. R. 616. (On March 27, 2008, on a visit to the emergency room for physical issues, her mood and affect were normal. R. 876.) Ms. Hendricks passed out again in May 2008. R. 921. The following months brought treatment for anxiety, abdominal pain, urination issues, chest pain, and shortness of breath. R. 914-20.

Ms. Hendricks was admitted to North Florida Medical Center for chest pain on December 17, 2008.   R. 1110-11.   She was advised to undergo a stress test but declined and was discharged on December 18, 2008.   Her discharge diagnosis was chest pain, unknown etiology, history of probable bipolar disorder and hyperlipidemia, and a recommendation to pursue further testing to rule out heart disease.   *Id.*

At the request of the state agency, on June 16, 2008, Janet K. Humphreys, Ph.D., examined Ms. Hendricks.   R. 732-35.   Ms. Hendricks reported a depressed mood, irritability, anxiety with difficulty falling asleep and staying asleep, anhedonia, guilt, low energy, poor concentration, a 20-pound weight gain in the past three months, and suicidal ideation.   R. 732.   On examination, Ms. Hendricks spoke spontaneously at a slow rate, no peculiarity of gait was noted, and she was cooperative.   R. 733. Examination revealed her mood was depressed and her affect congruent.   She admitted to passive suicidal ideation and occasional hallucinations, "but strongly denied intent and plan.   She denied homicidal ideation, intent, and plan."   *Id.*

Dr. Humphreys observed that Ms. Hendricks reported depressed mood with some manic features and daily visual hallucinations, although she "denied any during examination," and she had panic attacks.   *Id.*   Her thought content was normal and she had good insight and judgment and her thought processes were logical and goal-oriented.   *Id.* Her mood likely impacted her perception of pain.   R. 734.

Ms. Hendricks was diagnosed with mood disorder NOS, psychotic disorder NOS, panic disorder without agoraphobia, and pain disorder associated with both psychological factors and a general medical condition.   *Id.*   Her recent memory appeared mildly

impaired which may impact her ability to carry out complex instructions and she had some

impairment of concentration for numerical operations and could benefit from assistance in

managing her funds. "Her social skills and judgment appeared adequate." *Id.*

From June 2008 through April 2010, Ms. Hendricks was treated at Meridian.

R. 1124-1397. In mid-2008 to late 2008, Ms. Hendricks was reporting thoughts of

hurting herself as well as auditory hallucinations. R. 1335-42.

On July 29, 2008, Ms. Hendricks was Baker-Acted ("BA52B (Prof)") and admitted

to the acute crisis stabilization unit (CSU), level I, at Meridian for a suicide attempt.

R. 747-753, 1146-54, 1350-81. She was treated for suicidal thoughts and overdosing on

Motrin (200 mg tablets) due to family problems, after her husband and son had begun to

argue. R. 1148-49, 1153, 1350. She was assigned a current GAF score of

30 and 40.[5] R. 1154, 1357. Ms. Hendricks was stabilized and discharged on July 30,

2008. R, 748-53, 1350. An undated medical note indicates that Ms. Hendricks' motor

---

[5] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale). A GAF scale rating of 21 to 30 is indicative of behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas. DSM-IV-TR at 34. A GAF scale rating of 31 to 40 is indicative of some impairment in realty testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school

behavior and speech were normal, her cognition was grossly intact, her mood was fine,

her manner was appropriate, she denied suicidal ideation, and her prognosis was fair.

R. 1380-81; *see* R. 1147, 1357 (GAF score of 50 at discharge); *see also supra* n.5.   She

was diagnosed with depression NOS and anxiety disorder NOS and was "doing well" at

discharge.   She was prescribed Effexor and Seroquel.   R. 1147, 1357, 1360, 1370.

Progress notes dated September 9, 2008, reveal Ms. Hendricks had a medication

check with Sally Martinez, ARNP, at Meridian.   R. 1335.   She reported not sleeping at

night, an increase in angry outbursts, heard voices in her head telling her to break her

angels because they were not helping her.   She was seeing shadows.   She denied

suicidal ideation.   Her insight and judgment were poor, her mood was "so-so," and she

was diagnosed with depressive disorder NOS, anxiety disorder NOS, and rule out bipolar

disorder with psychotic features.   Nurse Martinez adjusted her medications (Effexor and

Seroquel).   R. 1336.   Also, on September 9, 2008, Ms. Hendricks followed up with

Brooke Watson for a treatment plan update after her overdose.

R. 1337-38.   She reported medication compliance and no side effects.   R. 1338.

---

functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.   *Id.*   The
"Commissioner has declined to endorse the GAF scale for 'use in the Social Security and
SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to
the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F.
App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21,
2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several
reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and
disabilities in its descriptors) and questionable psychometrics in routine practice.   In
order to provide a global measure of disability, the WHO DSM-5 (see the chapter
"Assessment Measures")."   DSM-5 at 16.

Ms. Hendricks continued treating with Nurse Martinez for medication and Ms. Hernandez (at Meridian) for therapy from October 2008 to April 2009, and did not report hallucinations and suicidal thoughts at certain appointments.   R. 1139-44, 1264-1340.

On October 17, 2008, Ms. Hendricks reported to Nurse Martinez she was hearing voices telling her to hurt herself, although her mood was "pretty good," and her insight and judgment were "fair."   R. 1328.   In November and December 2008, Ms. Hendricks experienced increased anxiety and agitation, although in November, her affect was normal, her thought process was goal-directed, she denied suicidal ideation, and her progress was fair.   R. 1314-18, 1321.   A November 12, 2008, substance abuse addendum form from Meridian noted that Ms. Hendricks' current and highest past year GAF score was 55, although her prognosis was guarded.   R. 1140.

Progress notes from December 2, 2008, indicate Ms. Hendricks experienced suicidal ideation for three days and was going to take pills, but her daughter locked them away.   Ms. Hendricks reported having problems with agitation during the day due to people living in her home.   She was sleeping well at night.   R. 1314-15.   For the following few weeks, progress notes reveal agitation and anxiety, poor insight and judgment, and continued hallucinations.   R. 1290, 1297, 1299, 1303, 1307.   On March 6, 2009, Ms. Hendricks exhibited mild paranoia.   R. 1282.   Her mood was sad.   *Id.*[6]

---

[6]   Ms. Hendricks was admitted to Shands on January 3, 2009.   R. 818-37.   She presented with chest pressure when trying to get up from a sitting position and experienced palpitations, nausea, and shortness of breath.   She was diagnosed with non-cardiac chest pain.   *Id.*

Ms. Hendricks' mental health symptoms continued through 2009.

Ms. Hendricks reported crying a lot in March 2009.   R. 1272.   She had difficulty

sleeping, sad mood, and flat affect.   She was hearing voices telling her to take a bottle of

Ibuprofen.   *Id.*   Her symptoms continued.   In May and June 2009, Ms. Hendricks was

having intermittent suicidal ideation, R. 1257, 1267, and cancelled multiple appointments

with Nurse Martinez and an appointment with Ms. Hernandez.   R. 1249-53, 1260.   As of

June 2009, Ms. Hendricks was admitted to the hospital for side pain and hyponatremia.

R. 1255.   She reported increased suicidal ideations and was told to stop her Effexor

75mg dose due to hyponatremia*.   Id.*

On July 12, 2009, Ms. Hendricks was admitted to Meridian for a suicide attempt.

R. 1126-48, 1212-14.   She was Baker-Acted after attempting to overdose on 30

Ibuprofen tablets after her niece did not invite her to her wedding.   Ms. Hendricks was

---

On January 7, 2009, Bayard D. Miller, M.D., of the neurology clinic at Shands
HealthCare, examined Ms. Hendricks for her possible seizures.   R. 892-94.   She
reported having black out spells in October 2007 and has no warning. She had loss of
bladder control with at least two episodes with jerking and stiffening and experienced
about three episodes a month on average.   Her EEG was reviewed.   She was
diagnosed with "[e]pisodes of loss of consciousness consistent with complex partial
seizures."   R. 894.   The following week she was admitted for chest pain.   R. 784-811.
She was discharged the next day on January 14, 2009, and was diagnosed with
non-cardiac chest pain.   R. 784.

Ms. Hendricks was admitted to North Florida Regional Medical Center on June 5,
2009, due to right-side flank pain.   R. 1088-97.   She was diagnosed with hyponatremia,
resolved; hypokalemia, resolved; and suspected urinary tract infection.   R. 1088.   She
continued to receive care for flank pain from Dixie County Health Department from July
2009 through October 2009.   R. 899, 905.   In August 2009,
Dr. Miller treated Ms. Hendricks for seizures.   R. 889-891.   She reported two seizures
since her last visit as well as headaches and was diagnosed with probable complex
partial seizures and probable migraine headaches.   R. 890; *see* R. 887-88 (11/19/2009,
visit with Dr. Miller-"Her past history is primarily for bipolar disease and lipid disturbance";
"[c]omplex partial seizures controlled with carbamazepine.").

assigned a GAF of 30 and was admitted for therapy and stabilization.   She was

discharged on July 14, 2009, and regretted her behavior.   R. 1137, 1226.   On

discharge, she denied suicidal ideation and she felt good.   R. 1128, 1233.   She was

assigned a GAF of 45, R. 1137, 1225, and was diagnosed with adjustment disorder,

unspecified.   R. 1129, 1227.

At Ms. Hendricks' post-hospitalization check with Nurse Martinez, she reported no

depression or auditory hallucinations since discharge from Meridian.   R. 1209-10.   On

August 7, 2009, she continued to have difficulty with hyponatremia.   Her mood was

"pretty good" and she denied hallucinations and suicidal ideations.   Her insight and

judgment were poor and diagnosed with a mood disorder, depression, and anxiety.

R. 1203.

Progress notes dated August 18, 2009, again indicated some increased

depression since stopping Effexor.   She was told to titrate off Effexor and start Cymbalta

as soon as possible and continue taking Seroquel.   R. 1201.   She heard voices telling

her to cut her hair.   *Id.*

At her September 18, 2009, therapy appointment with Ms. Hernandez,

Ms. Hendricks reported to practice relaxation skills and "positive thinking," and that "she

feels much better though she still has some periods of depression that may last 3 or 4

hours, 3 days out of the week.   She is pleased with her current medication regimen and

also asked questions about her diagnosis and treatment."   R. 1193.

At her October 20, 2009, medication check, although Nurse Martinez assessed poor insight and judgment, Ms. Hendricks reported her mood was "pretty good," and she denied auditory hallucinations and suicidal ideation.    R. 1188-89.

As of December 4, 2009, Ms. Hendricks told Nurse Martinez that she was taking her medications daily and sleeping well.    R. 1184.    She reported having "a couple of bad days," but "fairly good otherwise."    R. 1185.    She reported "seeing ghosts but her daughter sees it to."    She denied auditory hallucinations and suicidal ideation.    Her insight and judgment were poor.    Diagnoses were mood disorder and anxiety. *Id.*

The following months brought an increase in her depression and anxiety. R. 1158-82.    On January 15, 2010, Ms. Hendricks again reported to Nurse Martinez being more depressed, not sleeping well, and having psychosocial issues with her daughter and son-in-law.    R. 1181-82.    On January 26, 2010, she reported to Nurse Martinez being "more depressed," and she "thinks she sees someone standing over her shoulder."    R. 1177.    Nurse Martinez adjusted her mediations.    *Id.*; *see* R. 1124-25, 1178 (visit with Ms. Martinez).    On February 23, 2010, Nurse Martinez reported Ms. Hendricks had "good days, bad days."    R. 1170.    Her insight and judgment were poor and Ms. Hendricks was diagnosed with bipolar disorder I.    *Id.*    She saw Ms. Hernandez the same day and her affect was anxious and flat, but she denied suicidal ideation.    R. 1172.    Despite changes in medications over the previous months, Ms. Hendricks still reported difficulty sleeping on March 23, 2010.    R. 1165-69.    Ms. Hendricks also described increasing depression and suicidal ideation.    She was going to

take pills again, but they were locked up.   She was told to stop Trazadone and she was started on Haldol.   She continued taking other medication including Clonidine, Cymbalta, and Seroquel.   R. 1166.

On March 29, 2010, Nurse Martinez wrote a letter to counsel for Ms. Hendricks.   R. 1397.   Ms. Hendricks had been seen at the Meridian clinic since September 9, 2008, and, prior to that, was treated by Dr. Walker.   Nurse Martinez noted that Ms. Hendricks suffered from a mood disorder, depressed with psychotic features, and anxiety.   She had been treated with multiple medications and had intermittent periods of suicidal ideations and multiple CSU admits in the past.   Nurse Martinez also stated, "Mrs. Hendricks is also intermittingly non compliant with maintaining follow-up appointments," although she was currently seen every four to six weeks.   *Id.*

On March 30, 2010, Ms. Hernandez completed a Psychiatric Review Technique (PRT) by checking boxes where appropriate.   R. 1382-93.   Ms. Hernandez stated that Ms. Hendricks had been treated from July 2007 to the present.   R. 1383.   She opined that Ms. Hendricks met the requirements of Listing 12.04, affective disorder, and further opined that she had extreme limitations in her activities of daily living, in maintaining social functioning, in maintaining concentration, persistence, or pace, and had repeated episodes of decompensation, each of extended duration.   R. 1382, 1385, 1392.   She also opined that Ms. Hendricks suffered from depressive syndrome with symptoms of anhedonia, sleep disturbance, decreased energy, feelings of guilt, difficulty concentrating, and thoughts of suicide and hallucinations and suffered from manic symptoms and was easily distracted, as well as hallucinations, delusions, or paranoid

thinking.   R. 1385.   Ms. Hernandez further stated that Ms. Hendricks had

anxiety-related disorder, Listing 12.06, with generalized persistent anxiety, motor tension,

apprehensive expectations, and recurrent and intrusive recollection of a traumatic

experience.   R. 1387.

On March 30, 2010, Ms. Hernandez also completed a Mental Residual Functional

Capacity Assessment and opined, by checking appropriate boxes, that

Ms. Hendricks would suffer from *marked* limitations in her ability to remember work

procedures; understand, remember, and carry out simple or detailed instructions;

maintain attention and concentration for extended periods; perform activities within a

schedule; maintain regular attendance and be punctual; sustain ordinary routine without

special supervision; work in coordination with or proximity to others without being

distracted by others; make simple work decisions; and complete a normal workweek or

workday without interruptions from psychologically based symptoms.   She would have

*marked* limitations in her ability to interact appropriately with the public, accept

instructions, get along with co-workers or peers, maintain socially appropriate behavior,

respond appropriately to changes in a work setting, be aware of normal hazards, and

travel to unfamiliar places or to set realistic goals.   R. 1394-95.   Ms. Hernandez did not

provide a narrative supporting her check-off opinions in either assessment.

R. 1382-96.

On April 9, 2010, Ms. Hendricks told Nurse Martinez that she was still unable to

sleep and was having hallucinations.   R. 1161.   On the same date, Ms. Hendricks

reported to Ms. Hernandez that "she has been very anxious lately.   She thinks because

her disability hearing is coming up next week.   She is also worried about her son as he continues to use drugs.   Encouraged Nancy to practice relaxation skills daily.   Also discussed and problem solved some of her concerns.   Nancy says she has been compliant with medication but that she is sleeping very little.   She will speak with the medical department about this."   Ms. Hendricks participated actively in the session; denied active suicidal or homicidal ideation; thought process was logical; and prognosis was fair.   R. 1162.

By April 20, 2010, Ms. Hendricks reported to Nurse Martinez that her mood was "better," her hallucinations were less loud, and she denied suicidal ideation, although insight and judgment remained poor.   R. 1160.   She was continued on several medications, including Abilify, Clonidine, Cymbalta, and Seroquel.   Diagnosis was a mood disorder, depressed.   R. 1159-60.

### 3.  The Hearing

On April 14, 2010, the ALJ held the hearing.   R. 23, 1422-55.   As of the hearing date, several patient records such as admission and treatment at the CSU and counseling at Meridian were not yet part of the record.   R. 1424-25.   Exhibits 1-A through 16-F (consisting of approximately 886 pages) were admitted at the hearing. R. 3-7, 1426.   After the hearing, the remaining Exhibits, identified as B-17F through B-24F (patient notes and records from approximately March 2008 through April 2010) and B-1 SSI 1 (March 29, 2010, Nurse Martinez letter), were made a part of the record. R. 7-8.

The ALJ summarized Ms. Hendricks' hearing testimony:

> **In terms of what the claimant alleges as limitations**, the claimant testified that her daughter drove her to the hearing because the doctor stopped her from driving because of her seizure problem.   Stress triggers the seizures.   She lives with her husband and grown children and a 3 yr old and a 4 yr old of her daughter's.   The claimant said she does not play around with them.   She stays in bed a lot.   She spends most time in her room.   Her husband is on disability for multiple problems.   He and the daughter do the chores, but the daughter does mostly everything.   She feels tired all the time.   She has difficulty sleeping.   For the past few days she has not slept because she had this hearing on her mind.   She has last worked in 2004 at Wal-Mart as a Cashier.   She started getting sick, inhaled fumes on the job, and this caused breathing difficulty.   She still has breathing difficulty, and uses inhaler at times.
>
> Continuing with the claimant's testimony her physical and mental impairments are that she was molested as a child and the man that did it married her mom.   That has bothered her more and more lately.   She has anxiety attacks.   The claimant goes to Meridian Health Center; sees a counselor and they have her on medications.   She is only in the talking phase of the counseling sessions.   She was in CSU twice because she intentionally took Ibuprofen.   She felt that she did not want to live any longer.   Her daughter keeps her medications under lock and key because she still has those suicidal thoughts.   These thoughts are still strong.   She has panic attacks and arthritis in her knee.   Her weight is at 140 pounds.   She gained from about 110 pounds.   She does not know why the weight gain occurred, but believes that it is because of the medication.
>
> Continuing with the claimant's testimony, she says she sees someone standing over her shoulders and hears voices.   This might be once or twice a week and at other times it does not happen.   This happens more when she is under stress.   Sometimes the voices are just mumbling and other times they tell her to do things.   That is the reason that her daughter keeps her medications from her.   She does not remember the exact number of times she was in CSU.   The man that abused her, married her mom about 4 to 5 years ago.   She brings him to her house and this brings the memory of what happened to her.   She said that her mother knows that he did this to her.   She has a problem concentrating.   The things she used to enjoy, she cannot anymore.   He turns on the TV for some noise in the room.   When her daughter and her husband come in her room to sit with her, they turned the TV off because they know that she is not watching it.   Her son and son-in-law take drugs.   Her daughter is divorcing her husband.

R. 28; *see* R. 1426-48.

Richard Hickey testified as an impartial vocational expert.   R. 1448-53.
Mr. Hickey described Ms. Hendricks' employment as a cashier at the Dollar General and further described the job as low semi-skilled with an SVP of 3.   She also worked as a manager at the Dollar General, further described as light with a SVP of 7.   R. 1449-50.

Mr. Hickey was asked to assume a hypothetical person of claimant's age, education, and work experience who can do no more than light work as defined by the regulations but also has postural limitations of no climbing of ladders, ropes, or scaffolds; occasionally climbing of ramps or stairs; frequent balancing, stooping, crouching, kneeling, and crawling.   The individual also has environment limitations of avoiding concentrated exposure to irritants, such as fumes, odors, dusts, and gases, poorly ventilated areas.   And, this individual should avoid concentrated exposure to unprotected heights.   Lastly, Mr. Hickey was asked to assume the individual has non-exertional limitations such as this person's abilities are limited to simple, routine, and repetitive one or two-step tasks in a work environment free of fast-paced production requirements involving only simple one and two-step work related decisions with few, if any, work place changes.   R. 1450-51.   Mr. Hickey opined that such a person could not perform Ms. Hendricks' past work.   R. 1451.

He further opined that Ms. Hendricks could perform other jobs in the regional or national economy such as Cashier II, light, with a SVP of 2, with approximately 18,000 jobs in Florida and 300,000 nationally.   There are also Ticket Seller (in box offices) jobs that are light, with a SVP of 2, unskilled with approximately 20,000 in Florida and 300,000 to 400,000 nationally.   R. 1451-52; *see* R. 35.

The ALJ asked Mr. Hickey a second hypothetical. He was asked to assume a person of claimant's age, education, and work experience that due to a combination of medical conditions and mental impairments, this individual cannot sustain sufficient concentration, persistence, or pace to do even simple, routine tasks on a regular and continuing basis for eight hours a day, five days a week or a 40-hour work week or an equivalent work schedule. R. 1452. Mr. Hickey opined that such a person could not perform any work. R. 1452-53. Ms. Hendricks' counsel believed the second hypothetical captured "the essence of the medical evidence in this case," including the records from the Meridian CSU (which counsel claimed "are very critical to this case"), and her testimony. R. 1453-54.

### 4. The ALJ's Decision

At step two, the ALJ determined that Ms. Hendricks had several severe impairments including affective disorder with psychosis; COPD; and seizure disorder. R. 25. The ALJ did not find her non-cardiac chest pain and right flank pain to be severe. *Id.*; *see supra* at 3.[7]

At step three the ALJ determined that Ms. Hendricks had no impairment or combination of impairments that met or equaled a listing. R. 26-27; *see supra* at 4. In making this determination, the ALJ relied on Ms. Hendricks' statements in an October 27, 2007, Function Report-Adult, Exhibit 2E. R. 456-68; *see* R. 29-30 (RFC determination). The ALJ concluded that Ms. Hendricks had *mild* restriction of activities of daily living; *mild*

---

[7] The ALJ is not required, however, to identify all of the impairments that should be considered severe. *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished); *see also* Mariarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).

difficulties in social functioning; *moderate* difficulties in maintaining concentration,

persistence or pace; and *no* episodes of decompensation of extended duration.   R. 26.

The ALJ acknowledged that the step two findings are not a RFC assessment.   R. 27.

The ALJ also determined Ms. Hendricks' RFC and considered her hearing

testimony, R. 28, *see* R. 1426-48, the October 27, 2007, Function Report-Adult, R. 29-30,

456-68, Exhibit 2E, and medical evidence, beginning in and around March 2007, through

April 2010 (progress notes at Meridian).   R. 28-34.

The ALJ began his discussion of the medical evidence, Exhibit B22F, R. 7,

1127-1381, regarding Ms. Hendricks' mental status when she was seen at Meridian on

July 29, 2008, and, according to the ALJ, "the claimant had a physical examination with

no limitations."   R. 31.   In fact, Ms. Hendricks was Baker-Acted and admitted to the CSU

at Meridian for a suicide attempt.   She was treated for suicidal thoughts and overdosing

on Motrin.   R. 747-753, 1146-54, 1350-81.   She was stabilized and discharged on July

30, 2008, with a diagnosis of depression NOS and anxiety disorder NOS, was "doing well"

at discharge, and assigned a GAF score of 50, having received GAF scores of 30 and 40

on admission.   R. 1147, 1154, 1357, 1360, 1380-81.

The ALJ does not mention visits with Nurse Martinez and others from September

9, 2008, to November 12, 2008.   R. 1140, 1314-18, 1321, 1328, 1331-32, 1335-38.   The

ALJ refers to a visit on December 2, 2008, stating that Ms. Hendricks had a "good

evaluation" at Meridian.   R. 31.   Ms. Hendricks had experienced suicidal ideation for

three days and was going to take pills, but her daughter locked them away.   R. 1314-15.

For the following few weeks, progress notes reveal agitation and anxiety, poor insight and

judgment, and continued hallucinations.   R. 1290, 1297, 1299, 1303, 1307.   The ALJ noted reports (February 20, 2009) of family stress as her "trigger point and not stress in a workplace setting."   R. 31.

The ALJ noted reports of other medical/physical issues in January 2009 to June 2009, including Dr. Miller's examinations (in January and November 2009), "treating her for non-epileptic seizure disorder."   R. 31.   The ALJ does not mention reports of Ms. Hendricks' intermittent suicidal ideation in May and June 2009, R. 1255, 1257, 1267, and her missing appointments with Nurse Martinez and an appointment with Ms. Hernandez.   R. 1249-53, 1260.

The ALJ noted that on July 12, 2009, Ms. Hendricks "was screened under the Baker Act and diagnosed with Depressive Disorder, NOS," and on July 14, 2009, she was discharged after "an attempted overdose with a GAF of 30, though the assessment was normal."   R. 31.   He does not mention she regretted her behavior, denied suicidal ideation, assigned a GAF score of 45, felt good on discharge and diagnosed with adjustment disorder, unspecified.   R. 1126-48, 1212-14, 1224.

The ALJ does not discuss patient notes from Ms. Hernandez and Nurse Martinez from August 2009 to December 2009, where her mood was described as "pretty good' and she denied hallucinations and suicidal ideations in August and October 2009, and reported taking her medications daily and sleeping well, despite increases in depression, and reported having "a couple of bad days," but "fairly good otherwise" in December 2009.   She was still diagnosed with mood disorder, depression, and anxiety during this time.   R. 31, 1184-85, 1188-89, 1193, 1201, 1203, 1209-10.

The following months brought an increase in her depression and anxiety. R. 1158-82. The ALJ refers to a January 17, 2010, admission to Shands noting Ms. Hendricks' chief report of a toothache. "There were no physical limitations found during the examination" and Ms. Hendricks "was discharged 51 minutes after being seen by a doctor." R. 32. The ALJ does not mention Nurse Martinez's notes of January 15, 2010, when Ms. Hendricks reported being more depressed, not sleeping well, and having psychosocial issues with her daughter and son-in-law and, on January 26, 2010, again reporting that she was "more depressed." Medications were adjusted. R. 1124-25, 1177-78, 1181-82.

The ALJ concluded that the progress notes and findings from Meridian from February, March, and April 2010, "regarding the claimant's mental health status continue to not support a listing." R. 32. During this time, Ms. Hendricks reported to Nurse Martinez having "good days, bad days," R. 1170, denying at times yet reporting at times suicidal ideation, R. 1165-66, 1172, and some difficulty sleeping despite medications changes, R. 1161-62, 1165-69. Ms. Hendricks' insight and judgment remained poor, her reported affect was anxious and flat. R. 1171. She was told to stop taking Trazadone and started on Haldol and continued taking Clonidine, Cymbalta, and Seroquel. R. 1161, 1166. By April 20, 2010, Ms. Hendricks reported to Nurse Martinez that her mood was "better," her hallucinations were less loud, and she denied suicidal ideation, although her insight and judgment remained poor. R. 1160. Her diagnosis was mood disorder, depressed. R. 1159-60.

The ALJ also relied on and reported the opinions of examining non-treating

sources such as Dr. Chodosh's January 16, 2008, disability examination results, R.

28-29, 32, and Dr. Carr's February 4, 2008, adult mental health evaluation, R. 32.   The

ALJ considered the state agency consultant reports of Dr. Long (reviewing the physical

evidence) dated February 29, 2008, R. 33; Dr. Sandrik (reviewing the mental medical

evidence) dated February 18, 2008, *id.*; and the July 16, 2008, report of Dr. Vergara

(reviewing the mental medical evidence), R. 34.

The ALJ considered Ms. Hernandez's PRT dated March 30, 2010, R. 33, 1382-93,

but assigned no weight to her opinion stating:

> Maria Hernandez, M.S., (therapist) filled out a [PRT] on March 30, 2010, Exhibit
> B23F, believing that the claimant meets the listing of 12.04 Affective Disorder, with
> the claimant having extreme restrictions on activities of daily living, extreme
> difficulties in maintaining social functioning, extreme difficulties in maintaining
> concentration, persistence or pace, and extreme episodes of decompensation.
> Ms. Hernandez did not offer a narrative to show the objective medical basis
> for her conclusions.   Ms. Hernandez appears to be a therapist with a master's
> degree and is not a doctor in psychology or psychiatry.   The progress notes in the
> claimant's past mental medical history at Meridian Behavioral Healthcare, Inc., do
> not support this conclusion.   For these reasons, the undersigned has assigned no
> weight to the opinion of Ms. Hernandez.   For the reasons stated it is inconsistent
> with the objective medical evidence of record.

R. 33.   As of March 2010, Ms. Hendricks had sought therapy from Ms. Hernandez on a

weekly basis and saw Nurse Martinez regularly for medication checks, except when

missing noted appointments.   Prior to the agency's denial of reconsideration in July

2008, the record of Ms. Hendricks's mental status and treatment as reported by her and

which was the subject of state agency reviews was "far different" as noted by

Ms. Hendricks.   Doc. 26 at 16-17.

The ALJ determined that Ms. Hendricks had the RFC to perform light work with restrictions, including work "limited to simple, routine and repetitive 1-2 step tasks, in a work environment free of fast paced production requirements, involving only simple 1-2 step work related decision, with few, if any, work place changes." R. 27. The ALJ stated that his RFC assessment was supported by the opinions of the state agency consultants/examiners named above. R. 34.

The ALJ determined that Ms. Hendricks could not perform any past relevant work, here, as a retail manager, R. 34, but could perform other jobs such as Cashier II and Ticket Seller. R. 35.

### 5. The ALJ's RFC Determination

The RFC is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). It is an assessment based upon all of the relevant evidence, including a claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining the RFC lies with the ALJ. 20 C.F.R. §§ 404.1545(c), 416.945(c).

In support of the first argument, Ms. Hendricks argues that the evidence, submitted after reconsideration was denied on July 18, 2008, comprises approximately 800 pages,[8] demonstrates the decline of her mental status; that the ALJ he did not meaningfully analyze this evidence; and that the state agency consultants and examiners did not have this evidence available when they prepared their reports that

---

[8] It appears these are the records mentioned at the hearing before ALJ Rose that were submitted after the close of the hearing and mentioned above. *See supra* at 24-25; *see also* R. 7-8.

predated this evidence.   According to Plaintiff, these errors lead to an erroneous RFC assessment and ultimate disability determination.[9]   Doc. 26 at 11-17.

State agency medical consultants are non-examining sources who are highly qualified physicians and experts in Social Security disability evaluation and their opinions may be entitled to great weight if supported by evidence in the records. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

Ms. Hendricks does not take issue with the ALJ's reliance on the opinions of the state agency consultants to the extent they opined on the condition of Ms. Hendricks *prior* to the material onset of her mental decline during on or about July 2008 when reconsideration was denied and when she was Baker Acted on July 29, 2008.

For example, Dr. Humphreys examined Ms. Hendricks on June 16, 2008, R. 732-35, and Dr. Vergara's non-examining review of the medical evidence was July 16, 2008, R.736-46.   Dr. Carr's evaluation was on February 4, 2008, R. 523-26.   Dr. Sandrik's record review of the evidence occurred on February 18, 2008.   R. 33, 528-45.   Dr. Chodosh's second disability examination was on January 16, 2008, R. 32, 516-22.

---

[9]   In support of her second argument, Ms. Hendricks relies on Ms. Hernandez's March 30, 2010, PRT in which she opined (via a check-off form) that Ms. Hendricks met listing 12.04 criteria and that she had extreme restrictions on activities of daily living, extreme difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and had extreme episodes of decompensation. R. 1382-96.   The issues are related and will be considered together.

The ALJ mentions the opinions of Drs. Chodosh, Vergara, Sandrik, and Carr, R. 32-34, but not Dr. Humphreys.   The reviewed opinions are not favorable to Ms. Hendricks as noted by the ALJ as is the opinion of Dr. Humphreys.   R. 34.

Rather, Ms. Hendricks argues that all of these state agency opinions are outdated to the extent they pre-date the exacerbation of her mental illness around July of 2008, and, as a result, the ALJ erred in relying on these opinions.   "This is not a universal rule."   <u>Greiner v. Colvin</u>, Civil Action No. 12-1433, 2013 U.S. Dist. LEXIS 112990, at *14 (W.D. Pa. July 1, 2013).   The Commissioner argues that the ALJ did not err in relying on these opinions "because he also considered the medical records submitted after these opinions were rendered, and substantial evidence otherwise supports the decision (Tr. 27-34)."   Doc. 27 at 15 (citations omitted).

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.   Only "where additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent to any impairment in the Listing," is an update to the report required.   SSR 96-6p, 1996 SSR LEXIS 3 (July 2, 1996) (emphasis added). The ALJ reached no such conclusion in this case.

<u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011) (footnote omitted).

Here, the ALJ commented on some of the medical evidence that post-dated July 2008, including Ms. Hernandez's PRT, which he rejected.   R. 31-32.   The ALJ relied on the opinions of the state agency consultants, but did not expressly comment on whether the almost two-year lapse between Dr. Vergara's assessment in July 2008, the last state agency consultant report, and the ALJ's decision in June 2010, and the

intervening medical records, did not require a re-assessment by a state agency consultant.

Ms. Hernandez is not an acceptable medical source such as a licensed physician or licensed or certified psychologist or the like. 20 C.F.R. §§ 404.1513(a)(1)-(2), 416.913(a)(1)-(2). Rather, therapists, like Ms. Hernandez, are considered "other sources" and their opinions are not entitled to the same weight as afforded the opinions of a treating psychiatrist or psychologist. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *see* <u>Osterhoudt v. Astrue</u>, Case No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011) (nurse practitioner).

In addition to evidence from listed acceptable medical sources, the Commissioner, however, "may also use evidence from other sources [such as a therapist] to show the *severity* of [a claimant's] impairment(s) and how it affects [their] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d) (emphasis added). Further, the "other source" opinion is afforded weight to the extent that it is supported by the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d), including the treatment provided, the extent of the examinations and testing performed, the consistency with the other evidence, and the degree of explanation provided with the opinion. *See* Social Security Ruling (SSR) 06-3p.

Notwithstanding Ms. Hernandez's several-year relationship with Ms. Hendricks as reflected in the progress notes, the ALJ properly discounted Ms. Hernandez's PRT assessment provided in the form regarding the severity of Ms. Hendricks' impairments

and how any such impairment affected her ability to work because the form did not contain narrative descriptions or objective medical findings to support the opinion. *See* Osterhoudt v. Astrue, 2011 U.S. Dist. LEXIS 5781, at *7; 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *see also* Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that the 'check-off form' did not cite any clinical test results or findings and Dr. Lowder's previous treatment notes did not report any significant limitations due to back pain, the ALJ found that the MMS was entitled to 'little evidentiary weight.'") Also, no treating or consulting medical source opined that Ms. Hendricks was functionally limited to the extent she could not work.

The Commissioner argues that the ALJ considered "all of the evidence of record" thus negating any issue regarding whether he should have referred the case to another state agency consultant. Doc. 27 at 14. There is case law that suggests that it is not error for the ALJ to have relied on the alleged outdated opinions of state agency consultants where the ALJ has the relevant evidence before him and it is obvious the ALJ had considered all of the evidence. *See generally* Zellner v. Astrue, Case No. 3:08-cv-1205-J-TEM, 2010 U.S. Dist. LEXIS 46361 at *18-22 (M.D. Fla. Mar. 29, 2010). It is also true that the ALJ is not required to specifically refer to every piece of evidence in his decision. *See* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (cited in Zellner). "The ALJ is required, however, to consider all the presented evidence in making his findings and the ultimate disability determination." Zellner v. Astrue, 2010 U.S. Dist. LEXIS 46361 at *21-22.

Here, the ALJ had all of the relevant evidence before him and Ms. Hendricks does not suggest to the contrary.   As noted above, the ALJ referred to some of the post-July 2008 evidence, albeit mostly in a cursory fashion.[10]   R. 31-32.   Although this is a close call, the Court finds the opinions of the reviewing sources pre-dating July 2008, were made early in the case before the record was fully developed and, therefore, were given without the benefit of significant medical evidence that *could* influence the opinions.   *See generally* Zellner v. Astrue, 2010 U.S. Dist. LEXIS 46361 at *15-17 (M.D. Fla. Mar. 29, 2010); *but see* Surber v. Comm'r of Soc. Sec., Case No. 3:11-cv-1235-J-MCR, 2013 U.S. Dist. LREXIS 29254, at 16-18 (M.D. Fla. Mar. 5, 2013).[11]

## V.  Conclusion

Considering the Record as a whole, the ALJ erred when he did not request a state agency medical source consultant to review the mental health records that were submitted after on or about July 2008 and/or request a medical source consultant to examine Ms. Hendricks in light of this evidence.   As a result, the ALJ's findings as to disability are not supported by substantial evidence and he incorrectly applied the law. Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **REVERSED**

---

[10]   The post-July 2008 medical evidence is a mixed bag with some favoring Ms. Hendricks and some supporting the ALJ's RFC determination.   Nevertheless, the ALJ may not pick and choose which evidence he considers in making the disability determination.   *See* McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986) (cited in Zellner).

[11]   In light of the decision reached herein, it is not necessary to resolve the third point on appeal.   *See* doc. 26 at 22-23.

and this case is **REMANDED** for further proceedings consistent with this Memorandum

Opinion and Order.   The Clerk shall enter Judgment for Plaintiff.

      **IN CHAMBERS** at Tallahassee, Florida, on November 7, 2013.


                **s/   Charles A. Stampelos**
                **CHARLES A. STAMPELOS**
                **UNITED STATES MAGISTRATE JUDGE**